**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| BRITTANY CARTER, | : | Case No. 1:22-cv-658 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| RELADYNE TRANSPORTATION, LLC, | : | |
| | : | |
| Defendant. | : | |

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Doc. 19)**

---

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 19). Plaintiff filed a Response in Opposition (Doc. 26), to which Defendant filed a Reply in Support (Doc. 28). Thus, this matter is ripe for the Court's review. For the reasons below, Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED**.

## FACTS

In November 2020, Plaintiff Brittany Carter began working for Defendant RelaDyne Transportation, LLC as a Senior Accounts Payable Analyst. (Carter Dep., Doc. 16, Pg. ID 88, 92; Offer Letter, Doc. 16, Pg. ID 221.) In this role, Plaintiff helped Defendant centralize the company's Accounts Payable ("AP") Department. (Carter Dep., Doc. 16, Pg. ID 97-99.) As a part of this centralization effort, Plaintiff was responsible for creating standard operating procedures ("SOPs") for the AP Department with a third-party consulting group called AMEND. (*Id.* at Pg. ID 96-97, 123.) Plaintiff was also responsible

for training other AP personnel, communicating with vendors, troubleshooting, and entering various data into Defendant's software. (*Id.* at Pg. ID 98-99, 100-104; *see also* Job Description, Doc. 16, Pg. ID 218.) Plaintiff worked alongside Debbie Oliver in this role, and the two supervised separate employees for the AP Department. (Schultz Dep., Doc. 18, Pg. ID 471, 483; Carter Dep., Doc. 16, Pg. ID 93, 101.) Megan Schultz supervised both Plaintiff and Oliver. (Schultz Dep., Doc. 18, Pg. ID 451-52.)

## I. Mother's Room Issues

Shortly after she was hired, Plaintiff notified Defendant that she had recently given birth and would need a room to pump breast milk (the "Mother's Room"). (Carter Dep., Doc. 16, Pg. ID 90.) Defendant assigned a space in Plaintiff's office building to become the designated Mother's Room. (*Id.* at Pg. ID 147.) But, when Plaintiff arrived for her first day, she discovered that the assigned room was a mop closet. (Carter Dep., Doc. 16, Pg. ID 147.) Plaintiff and another employee immediately looked around the building for a more suitable room. (*Id.* at Pg. ID 147-48.) Plaintiff found a new office space and began using it as a Mother's Room, but she quickly discovered that the new room lacked power and complained to Defendant. (*Id.*) Plaintiff maintains that Defendant remedied the power issue after a few months. (*Id.* at Pg. ID 148-50.)

Eventually, more people began working in person for Defendant. (Schultz Dep., Doc. 18, Pg. ID 478.) So, Defendant assigned an employee to the office being used as the Mother's Room and assigned a conference room as the new Mother's Room. (*Id.*; Carter Dep., Doc. 16, Pg. ID 152.) After a few weeks of using the conference room, Plaintiff complained to Defendant that the room lacked privacy. (Carter Dep., Doc. 16, Pg. ID 153.)

So, Plaintiff and Schultz identified a more private room to be the new—and final—Mother's Room. (Carter Dep., Doc. 16, Pg. ID 153; Schultz Dep., Doc. 18, Pg. ID 480-81.)

After Plaintiff selected the final room to be the Mother's Room, Defendant cleaned it. (June 30, 2021 Correspondence, Doc. 16, Pg. ID 230.) Schultz then directed Plaintiff to inspect the room and identify any outstanding issues. (*Id.*) Plaintiff checked the room and found that it was not suitably clean. (Carter Dep., Doc. 16, Pg. ID 155-61.) Plaintiff notified Defendant that there were bugs, cobwebs, and dust in the room. (*Id.*; July 6, 2021 Correspondence, Doc. 16, Pg. ID 229-30; Room Photos, Doc. 16, Pg. ID 232-36.) Defendant then ordered the office's cleaning crew to remedy those issues. (Carter Dep., Doc. 16, Pg. ID 159-63; July 6, 2021 Correspondence, Doc. 16, Pg. ID 237.) Plaintiff maintains that the cleaning issue took a month to finally fix, only after multiple complaints. (Carter Dep., Doc. 16, Pg. ID 156.)

Plaintiff asserts that other issues occurred in relation to the Mother's Room. Plaintiff maintains that another employee told Plaintiff that Oliver constantly pulled the employee out of the Mother's Room while she was pumping for unscheduled meetings. (Carter Dep., Doc. 16, Pg. ID 188-89.) Plaintiff also maintains that Oliver would complain about how long it took employees to pump in the Mother's Room. (*Id.* at Pg. ID 189.) Plaintiff asserts that she reported Oliver's conduct to Schultz's supervisor, Marie Brooks, but that neither Brooks nor Defendant investigated the matter. (*Id.*) Brooks does not remember such a conversation. (Brooks Dep., Doc. 17, Pg. ID 339-40.)

## II.  Performance Issues

In the meantime, Plaintiff began having issues in her role. Schultz noticed that

3

Plaintiff was failing to timely complete tasks or effectively communicate. (Schultz Dep., Doc. 18, Pg. ID 462-64.) Schultz talked to Plaintiff about these concerns and memorialized these conversations through emails sent to Plaintiff. (*Id*. at Pg. ID 465.)

Plaintiff was failing to complete tasks promptly. For example, on several occasions, Plaintiff failed to meet deadlines to provide certain information to AMEND. (Schultz Dep., Doc. 18, Pg. ID 498; April 23, 2021 Correspondence, Doc. 16, Pg. ID 225; Aug. 10, 2021 Correspondence, Doc. 16, Pg. ID 228.) Plaintiff also failed to make timely payments to vendors or timely enter checks received by vendors into the system. (Carter Dep., Doc. 16, Pg. ID 121; April 23, 2021 Correspondence, Doc. 16; Aug. 23, 2021 Correspondence, Doc. 16, Pg. ID 248-49; Oliver Dep., Doc. 25, Pg. ID 1106.) These mistakes created "a domino effect" of problems, such as delaying the SOPs development and creating errors in the company's software. (Schultz Dep., Doc. 18, Pg. ID 473; Aug. 23, 2021 Correspondence, Doc. 16, Pg. ID 248.)

Plaintiff also struggled to communicate with her team. For example, sometime in August 2021, Plaintiff failed to update a report before a team meeting. (Aug. 10, 2021 Correspondence, Doc. 16, Pg. ID 266-27.) Plaintiff was not present at the meeting and had not updated her team on her status, so the team could not provide an update on Plaintiff's work. (*Id*.) This caused the AP Department to look unorganized to the rest of the company. (*Id*. at Pg. ID 226.)

Plaintiff also failed to communicate with Oliver and Schultz about an incentive program that she had created with another employee, Carol Overberg. (Schultz Dep., Doc. 18, Pg. ID 486-87; Carter Dep., Doc. 16, Pg. ID 173.) So, when Plaintiff announced the

4

program at an AP Department meeting, Schultz and Oliver felt "blindsided." (Schultz Dep., Doc. 18, Pg. ID 486-87; Carter Dep., Doc. 16, Pg. ID 173-74.) Schultz messaged Plaintiff about the matter. (Schultz Dep., Doc. 18, Pg. ID 487.) Plaintiff then shared Schultz's message with Overberg—which upset Overberg. (*Id.*)

Plaintiff had more communication issues with Oliver. (Schultz, Doc. 18, Pg. ID 500; May 24, 2021 Correspondence, Doc. 16, Pg. ID 246.) For example, Plaintiff often helped Oliver's subordinates without notifying Oliver. (Schultz, Doc. 18, Pg. ID 485-500.) Plaintiff also felt that Oliver was disrespectful to her subordinates, and she openly discussed this opinion with Oliver's subordinates. (Carter Dep., Doc. 16, Pg. ID 166-72; Schultz Dep., Doc. 18, Pg. ID 485-86.)

## III. Next Steps

Plaintiff maintains that Defendant has a "management policy of steps towards termination" for when an employee engages in misconduct. (Carter Dep., Doc. 16, Pg. ID 141.) These steps include a performance improvement plan ("PIP"), as well as verbal and written warnings. (*Id.*) However, Defendant's Employee Handbook states that "[i]t is within [Defendant's] sole discretion to determine the [disciplinary] action, corrective or otherwise," for employee misconduct. (Handbook, Doc. 18, Pg. ID 589.) The determination of appropriate discipline is usually left with Defendant's Human Resources ("HR") Department. (Schultz Dep., Doc. 18, Pg. ID 531.)

After the "accumulation of so many performance issues" by Plaintiff, Schultz submitted the matter to HR for its consideration. (Schultz Dep., Doc. 18, Pg. ID 476.) After reviewing the documents, HR determined that the appropriate next step was the

termination of Plaintiff. (*Id.* at Pg. ID 488.)

HR assembled an "Evaluation of Dismissal" document, identifying its reasoning for Plaintiff's termination. (Schultz Dep., Doc. 18, Pg. ID 488; Evaluation of Dismissal, Doc. 18, Pg. ID 631-32.) The Evaluation identified Plaintiff's various performance issues and linked them to specific conduct rules prescribed to Plaintiff's role. (*See* Evaluation of Dismissal, Doc. 18, Pg. ID 631-32.) The Evaluation discussed Plaintiff's "unwelcomed, inappropriate[,] and offensive" behavior regarding Oliver, which implicated Defendant's anti-harassment policy. (*Id.*) The Evaluation noted that an email had previously been sent to Plaintiff, which discussed how Plaintiff needed to "work better" with Oliver. (*Id.*) The Evaluation also discussed Plaintiff's other performance issues, including her failure to carry out certain duties. (*Id.*)

## IV. Termination

Around the time HR decided to terminate Plaintiff, Plaintiff was quarantining at home because her daughter had contracted COVID-19. (Carter Dep., Doc. 16, Pg. ID 204-05.) Plaintiff maintains that Defendant called her into the office on her last day of quarantine to terminate her. (*Id.* at Pg. ID 205.) Schultz, however, maintains that Plaintiff was terminated after her quarantine was over. (Schultz Dep., Doc. 18, Pg. ID 490.)

In any event, on September 3, 2021, Plaintiff met with Schultz and two other employees, who informed Plaintiff that she was being terminated. (Schultz Dep., Doc. 18, Pg. ID 490; Sept. 3, 2021 Correspondence, Doc. 18, Pg. ID 633-34.) Schultz maintains that she informed Plaintiff that her termination was based on her performance issues that had previously been discussed with her. (Schultz Dep., Doc. 18, Pg. ID 490-91; Sept. 3, 2021

6

Correspondence, Doc. 18, Pg. ID 633-34.) In contrast, Plaintiff maintains that she was not given any reason for her termination. (Carter Dep., Doc. 16, Pg. ID 203.)

On November 11, 2022, Plaintiff brought claims against Defendant for gender/pregnancy discrimination and retaliatory discrimination in violation of Title VII and the Ohio Revised Code, as well as wrongful termination in violation of public policy. (Compl., Doc. 1, ¶¶ 57-98.) Defendant moves for summary judgment on all of these claims. (Motion, Doc. 19.)

## LAW

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). And, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*,

477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

As noted above, Plaintiff brings claims against Defendant for (1) gender/pregnancy discrimination in violation of Title VII and the Ohio Revised Code, (2) retaliatory discrimination in violation of Title VII and the Ohio Revised Code, and (3) wrongful termination in violation of public policy. (Compl., Doc. 1, ¶¶ 28-54.) Defendant moves for summary judgment on all claims. (Motion, Doc. 19.) The Court will first consider Plaintiff's discrimination claims.

### I.   Discrimination Claims

Plaintiff brings gender/pregnancy and retaliatory discrimination claims against Defendant under both Title VII and the Ohio Revised Code. (Compl., Doc. 1, ¶¶ 57-86.) Both Title VII and Ohio law prohibit employers from discriminating against their employees on the basis of sex and for engaging in protected conduct. *See* 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02(A). "Because federal case law governing Title VII actions is generally applicable to discrimination claims under Ohio law," the Court may analyze all of the discrimination claims together. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (citing *Little Forest Med. Ctr. v. Ohio C.R. Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991)); *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998).

Where, as here, a plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, the Court applies the *McDonnell Douglas* burden-shifting

8

framework. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). The first step

of this framework requires a plaintiff to establish a prima facie case for discrimination. *Id.*

at 363. To establish a prima facie case for sex discrimination, a plaintiff must show that

she was: (1) a member of a protected class, (2) qualified for the position, (3) the victim of

an adverse employment action, and (4) replaced by someone outside the protected class.

*See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991). And, a prima facie case

of retaliation requires a showing that (1) the plaintiffs engaged in protected activity; (2)

the defendant knew of this protected activity; (3) the defendant subsequently took an

adverse employment action; and (4) a causal connection exists between the protected

activity and the adverse employment action. *Goller v. Ohio Dep't of Rehab. & Correction*,

285 F. App'x 250, 256 (6th Cir. 2008) (citation omitted).

Once the plaintiff establishes her prima facie case, the burden shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for the adverse

employment action. *Ang*, 932 F.2d at 548; *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th

Cir. 2014). If the defendant meets its burden, the burden shifts back to the plaintiff to

demonstrate that the defendant's reason was but a pretext for unlawful discrimination.

*Id.*; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The Court proceeds on the assumption that Plaintiff has proven her prima facie

case. Defendant too satisfies its burden of showing that it terminated Plaintiff for a

legitimate, nondiscriminatory reason: Plaintiff's repeated performance issues. (*See*

Motion for Summary Judgment, Doc. 19-1, Pg. ID 648, 652.) Poor performance is a

legitimate and nondiscriminatory reason for terminating an employee. *Hussain v.*

9

*Highgate Hotels, Inc.*, 126 F. App'x. 256, 265 (6th Cir. 2005) (citation omitted). The burden thus shifts back to Plaintiff to show that this reason is pretextual.

The fundamental question in the pretext analysis is: did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). A plaintiff must produce sufficient evidence such that a reasonable jury could doubt the employer's stated reason for its actions. *McCart v. Univ. of Cincinnati Found.*, No. 1:08-CV-656, 2010 U.S. Dist. LEXIS 34406, at *7 (S.D. Ohio Apr. 7, 2010). A plaintiff may refute an employer's proffered legitimate reason by showing that the reason (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

Plaintiff first argues that Defendant's reasoning was pretext because Plaintiff's performance issues "were sporadic throughout the year" and therefore insufficient to warrant dismissal. (Response, Doc. 26, Pg. ID 1174.) This argument fails to show pretext. Throughout her year of employment, Plaintiff failed to timely complete the responsibilities designated to her role on multiple occasions. (Schultz Dep., Doc. 18, Pg. ID 485-87, 498, 500; April 23, 2021 Correspondence, Doc. 16; August 10, 2021 Correspondence, Doc. 16, Pg. ID 226-28; Aug. 23, 2021 Correspondence, Doc. 16, Pg. ID 248-49.) These failures created a "domino effect" of problems both inside and outside the company. (Schultz Dep., Doc. 18, Pg. ID 473.) Plaintiff also had various communication issues that negatively impacted the company. (*See* Schultz Dep., Doc. 16, Pg. ID 486-500; May 24, 2021 Correspondence, Doc. 16, Pg. ID 246.) Defendant determined that these

10

performances issues warranted termination. (Schultz Dep., Doc. 18, Pg. ID 488.) Plaintiff's general disagreement with Defendant's determination, without any evidence to suggest that it was not based on an honest belief, is not enough to demonstrate pretextual intent. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285-86 (6th Cir. 2012) (As long as the employer held an honest belief in its proffered reason, "the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."). Thus, this argument fails to show pretext.

Next, Plaintiff argues that Defendant's reasoning was pretextual because she should have been placed on a PIP before being terminated. (Response, Doc. 26, Pg. ID 1174.) Though Plaintiff testified that Defendant had a "policy of steps towards termination, . . . including a PIP," (Carter Dep., Doc. 16, Pg. ID 141), she does not provide any evidence that such a policy existed or was enforced. (*See* Response, Doc. 26.) Plaintiff's lone statement is insufficient to create a question of fact on whether such a policy exists. *Daniels*, 396 F.3d at 734 ("A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant."). In fact, the Employee Handbook explicitly states that it is within Defendant's "sole discretion to determine the appropriate [disciplinary] action, corrective or otherwise," for employee misconduct. (Handbook, Doc. 18, Pg. ID 589.)

To be sure, Defendant engaged in proactive measures before determining that termination was appropriate. Defendant brought Plaintiff's performance issues to her attention multiple times, and these conversations were preserved through email correspondence forwarded to Plaintiff. (*See* April 23, 2021 Correspondence, Doc. 16, Pg.

11

ID 225; May 24, 2021 Correspondence, Doc. 16, Pg. ID 246; August 10, 2021 Correspondence, Doc. 16, Pg. ID 226-28; Aug. 23, 2021 Correspondence, Doc. 16, Pg. ID 248-49.) Still, Plaintiff continued to have performance issues. (Schultz Dep., Doc. 18, Pg. ID 476.) So, Defendant determined that Plaintiff's conduct warranted termination. (*Id*. at Pg. ID 476, 488.) Thus, Plaintiff's second argument fails to show pretext.

 Finally, Plaintiff argues that Defendant's reasoning was pretext because the Evaluation of Dismissal lists Plaintiff's complaints about Oliver's actions related to the Mother's Room as a reason for termination. (Response, Doc. 26, Pg. ID 1174.) But, Plaintiff's assertion is incorrect. To be sure, the Evaluation discusses Plaintiff's "unwelcomed, inappropriate[,] and offensive" behavior towards Oliver, how it negatively impacted the team, and how Defendant communicated with Plaintiff previously that she needed to "work better" with Oliver. (Evaluation, Doc. 18, Pg. ID 631.) The Evaluation does not refer to any complaints by Plaintiff about Oliver or the Mother's Room as reasons for termination. (*See id*.) Thus, this argument fails to show pretext.

 Plaintiff has failed to meet her burden to show that Defendant's proffered reason for terminating Plaintiff was pretextual. Accordingly, summary judgment must be entered in favor of Defendant on Plaintiff's Title VII and Ohio gender/pregnancy and retaliatory discrimination claims.

## II.   Wrongful Termination in Violation of Public Policy Claim

 Next, Plaintiff brings a wrongful termination in violation of public policy claim against Defendant. (Compl., Doc. 1, ¶¶ 87-98.) Plaintiff relates this claim to her

12

termination that allegedly occurred while she was quarantining for COVID-19 exposure. (*See id.*; Response, Doc. 26, Pg. ID 1174-79.)

A claim for wrongful termination in violation of public policy exists if the plaintiff can demonstrate (1) the existence of a clear public policy manifested in a state or federal constitution, statute or administrative regulation, or in common law; (2) the employee's termination would jeopardize that public policy; (3) the employee's termination was motivated by conduct related to that public policy; and (4) the employer lacked an overriding legitimate business justification. *Collins v. Rizkana*, 652 N.E.2d 653, 657 (Ohio 1995). The parties primarily dispute the first and fourth elements. (*See* Motion, Doc. 19, Pg. ID 654-59; Response, Doc. 26, Pg. ID 1174-79; Reply, Doc. 28, Pg. ID 1196-98.) Though, the Court need only consider the first element to determine the viability of this claim.

The first element for a wrongful termination claim requires the existence of a clear public policy. *See Collins*, 652 N.E.2d at 657. A "clear public policy" may be found in federal or state constitutions, statutes, administrative rules and regulations, or common law. *Sutton v. Tomco Machining, Inc.*, 950 N.E.2d 938, 943 (Ohio 2011). Plaintiff maintains that a clear public policy exists in favor of (1) providing employees with a safe working environment and (2) protecting employees from COVID-19 hazards. (Compl., Doc. 1, ¶¶ 88-89.) The Court will consider each in turn.

### a. Public Policy of Providing Employees with a Safe Working Environment

Plaintiff first argues that there is a clear public policy in favor of workplace safety laid out in Ohio Revised Code §§ 4101.11 and 4101.12. (Response, Doc. 26, Pg. ID 1174-77.) Section 4101.11 provides that:

> Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

Ohio Rev. Code § 4101.11. Likewise, § 4101.12 deals generally with employers not forcing employees to work in unsafe environments:

> No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

Ohio Rev. Code § 4101.12.

Ohio courts are divided on whether these statutes are specific enough to demonstrate a clear public policy of workplace safety. For example, the Sixth District Court of Appeals for Ohio found these statutes to be too "general and broad" to create a clear public policy. *Whitaker v. First Energy Nuclear Operating Co.*, No. OT-12-021, 2013 Ohio App. LEXIS 4026, at * 14-15 (Ohio Ct. App. Sept. 6, 2013). In contrast, the Tenth District Court of Appeals for Ohio found that §§ 4101.11 and 4101.12 "together establish that there exists a clear public policy . . . in Ohio favoring workplace safety for employees and frequenters." *Blackburn v. Am. Dental Ctrs.*, 22 N.E.3d 1149, 1158 (Ohio Ct. App. 2014).

This Court has recently found that §§ 4101.11 and 4101.12 are too broad to

14

constitute a clear source of public policy favoring workplace safety. *See Romero v. City of Middletown*, 479 F. Supp. 3d 660, 675 (S.D. Ohio Aug. 18, 2020). In doing so, the *Romero* Court aligned with the Sixth District's finding. *Id*. The Court noted that, "[a]lthough these statutes are certainly directed at the broad topic of workplace safety, and adopt a general rule that work premises should be maintained in a safe manner, they do not appear to articulate any specific public policy of the type that would support a discharge in violation of public policy claim, thus falling short on the specificity front." *Id*. Therefore, as this Court has previously found, §§ 4101.11 and 4102.12 do not create a clear public policy in favor of workplace safety.

Plaintiff nevertheless asks the Court to disregard *Romero* and find that §§ 4101.11 and 4101.12 create a clear public policy favoring workplace safety based on Ohio caselaw finding the same. (Response, Doc. 26, Pg. ID 1174-77.) But, even if this Court found that these statutes created a clear public policy in favor of workplace safety, this policy would likely not extend to the facts here. *See Rowe v. Hoist & Crane Serv. Grp.*, No. 110921, 2022 Ohio App. LEXIS 2972, at *16 (Ohio Ct. App. Sept. 8, 2022) (A plaintiff must "identify a public policy concern that applies to the facts of the case.").

Plaintiff connects her wrongful termination claim to the fact that she was terminated around the time that she was quarantining for COVID-19 exposure. (Compl., Doc. 1, ¶¶ 87-98; Response, Doc. 26, Pg. ID 1174-79.) However, an Ohio court has recently found that, while §§ 4101.11 and 4101.12 may create a clear public policy in favor of workplace safety, this policy does not extend to COVID-19 hazards. *Dudley v. Siler Excavation Servs.*, LLC, 210 N.E.3d 580, 588-90 (Ohio Ct. App. Mar. 6, 2023) (citing *Nat'l*

*Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661, 666 (2022)) ("[P]roviding a safe workplace does not mean the elimination of every outside illness that could potentially enter the workplace."). The Court reasoned that the "[c]reation of such a broad public policy exception would be unworkable and significantly undercut the doctrine of at-will employment." *Id*. at 589 (citation omitted). So, even if §§ 4101.11 and § 4101.12 created a policy favoring workplace safety, it would not be implicated by Plaintiff's alleged termination while quarantining. Thus, Plaintiff's first argument fails to show a clear public policy related to this case.

### b.  Public Policy of Protecting Employees from Covid-19 Hazards

Next, Plaintiff cites to Ohio's "Stay at Home" Order to argue that Ohio has a public policy favoring workplace safety, specifically in regards to COVID-19 exposures. (Response, Doc. 26, Pg. ID 1177-78.) The Stay at Home Order, which has since expired, ordered all Ohio residents to stay at their place of residence during the height of the COVID-19 pandemic. *See* Ohio Department of Health, Director's Stay at Home Order, https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf. Plaintiff provides an unpublished decision from the Court of Common Pleas of Lucas County, Ohio which found that the Stay at Home Order manifested "a strong public policy to stop the spread of the COVID-19 virus." *Deluca v. Famous Distrib., Inc.*, No. CI-21-855, 7 (Ohio Ct. App. Jan 4, 2022). The *Deluca* Court found that an employer's alleged termination of a plaintiff for his reporting of on-the-job COVID-19 exposure "would arguably run contrary to Ohio's clearly articulated policy of containing the spread of the disease." *Id*. However, the Court also found that

16

"the stay at home order does not require employers to permit employees exposed to COVID-19 to self-quarantine." *Id.*

So, even if this Court adopted *Deluca* and found that the Stay at Home Order created a clear public policy to stop the spread of the COVID-19 virus, Plaintiff would still not be able to connect that policy to the facts at hand. While the parties dispute whether Plaintiff was terminated during or after her quarantine term (*see id.*; Schultz Dep., Doc. 18, Pg. ID 490), the *Deluca* Court found that the public policy in favor of containing COVID-19 did not extend to an employer's decisions related to an employee's self-quarantining. *Deluca*, No. CI-21-855, at 7. Thus, even if Ohio's Stay at Home Order created a public policy in favor of protecting employees from COVID-19 exposure, it would not be implicated by Plaintiff's alleged termination while quarantining. Plaintiff's second argument consequently fails to show a clear public policy related here.

Plaintiff's wrongful termination claim fails because she has not identified a clear public policy related to the facts at hand. And, even if she had, Plaintiff has presented no evidence to show that Defendant lacked an overriding legitimate business justification for her termination. As discussed above, Defendant has presented a valid reason for terminating Plaintiff and has supported this reason with substantial evidence. *See Kuivila v. City of Conneaut*, 430 F. App'x 402, 405 (6th Cir. 2011) (performance issues and inability to work professionally with others constituted an overriding legitimate business justification). Thus, summary judgment must be entered in Defendant's favor on Plaintiff's wrongful termination in violation of public policy claim.

17

**CONCLUSION**

Based on the foregoing, Defendant's Motion for Summary Judgment (Doc. 19) is

**GRANTED**. This case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND
